The Police Court, once again, my name is Carrie Merriam and I represent the appellant, Mr. McDonough. And I would, again, like to reserve three minutes or approximately three minutes for rebuttal. We request that this court reverse the judgment of the trial court concerning the imposition of a 40% valuation penalty in 1989 and a 20% negligence penalty in 1991. And because, and a little bit of background, this particular Hoyt partner invested in 1989, the first year that we have in front of us, and I would like to rely on the brief and also the argument that we had on Keller on the overvaluation penalty. I don't think we need to go into that again. The only piece to note here is that in this particular case, the Durham Farm 1 case, does control, it was the partnership level proceeding for Mr. McDonough's partnership. And so the determination that the benefits and burdens did not pass was actually made by the tax court for this case. The question here is, who has the burden of production or burden of proof on the penalties? And it's our position that the commissioner has the burden of production on the penalties for audits beginning after April 22, 1998. And that's pursuant to IRC Section 7491C. And the real issue here is whether it's the TEFRA audit that controls, which occurred before July 22, 1998, or the individual audit that occurred after, and that's undisputed. We're relying on the line of cases under Maxwell and Monroe, where the courts have clearly separated out the partnership proceeding from the individual partner proceeding. And then once the partnership proceeding ends, then we move on to affected items and other issues that might be. And there's case after case after case that describes what's an affected item, and the fact that penalties are affected items and penalties are subject to the deficiency procedure. It is a separate procedure. I had a little trouble figuring out what difference it makes in this case, whether the commissioner or the taxpayer has the burden. Could you explain what difference? Let's assume we agree that the commissioner has the burden. How does it affect the outcome, then? The burden of production could affect the outcome on the overvaluation penalty in the fact that once again the court would have to, the commissioner would have to show that cattle existed, that they would have to come forward with the evidence of that. And the burden of production would affect the negligence case in the fact that we would, this is supposed to have some meaning. And at some point the commissioner needed to show that there was a reason, that they contacted petitioners, that there was a reason to believe that this particular petitioner was negligent. And there was no attempt to do that. They just issued the statutory notice of deficiency. And even at the trial, at the trial memo two weeks before trial, there's nothing really in the trial memo that indicates anything about the burden of production, just that he's a white partner. To a certain extent the facts are what they are. And why is it that Hansen doesn't pretty much control? I understand that McDonough says that he did at least a couple of things that the Hansens didn't do, and that he actually went to the ranch and had a little bit of background in rodeo and cattle, whatever. But at the core, he didn't do any independent investigation, no independent appraisal, no sort of investigative follow-up. He read Bales himself, but relied in effect on the advice about what Bales meant from Hoyt, rather than getting a lawyer's advice about it. So why doesn't this kind of follow naturally from Hansen and other circuits' similar determinations? The first item to note is that both Hansen relied on the Mortensen case from the Sixth Circuit and the Vance Godden case from the Tenth Circuit. Neither of those cases were strongly decided for the commissioner. Mortensen in particular indicated that they felt that the case was much closer than the tax court believed it was and believed that Bales was a legitimate argument, and looked at all of the facts in the case. And in that particular case, there were a number of notices, including notices called a pre-filing notice. In approximately 1992, the IRS started sending out pre-filing notices, indicating that there's something wrong with this, this is a tax shelter, there's a problem with your cattle count. Mr. McDonough did not get those notices.  If I remember correctly, I may be getting them mixed up too, but he got some litigation advisories from Hoyt, as I recall, and he took losses that were three times what he popped in. He took losses or took deductions on partnerships that he hadn't even signed up for. I mean, how can that possibly be squared with any kind of reasonably prudent investor diligence? The losses three times what he paid in actually wasn't inconsistent with what Mr. McDonough had had in other investments that were fine, were acceptable. He expected initial losses, and that's what he saw. He also was familiar with cattle and the cattle business and knew there would be some depreciation losses up front. So that particular point is very common with an investment, not just a tax shelter, though it makes you question why he didn't do more. He thought he did do more. He waited 10 years. He went to the ranches. He saw thousands of cattle. Hoyt was still going 10 years after he heard about it and hadn't been shut down. Also, in this particular case, the Tenth Circuit took issue with the focus on due care as opposed to attributable to negligence, and in this particular case we submitted the evidence of the postal inspector, Jeffrey Hull, who indicated there is nothing that Mr. McDonough could have done to figure out what was going on, to have figured out what was going on. And, you know, where is the line here? Because you're not going to find a place where an individual Hoyt partner could have figured it out. Mr. Hull testified it took him, I believe, seven years, five to seven years, thousands and thousands of documents. He used grand jury subpoenas, search warrants, et cetera, and that's what it would take to figure out what's going on. The only thing that Mr. McDonough didn't do that is suspect or questionable or we wonder was the switching from partnerships, and Hoyt had a power of attorney. You and I might look at that a little bit more cautiously, but Hoyt had been doing this for 10 years. But that's the whole point of going to seek independent counsel. I mean, you know, you go to ask a lawyer what bails means. You don't rely on your own judgment, and you put somebody else on the hook for it. The bails case. You ask an accountant, does this all compute? I mean, I look at my losses, look at the fact that I'm now suddenly in partnerships I didn't even know I was in. I mean, what do you think of this? And maybe the accountant or the lawyer would have said, eh, you know, it looks okay. Maybe there's some risk, but it looks okay, in which case you've got something to hang your hat on. Which, by the way, Mr. Hull, believe that even professionals wouldn't be able to figure out what's going on. If you read the bails case, it says it's a test case. This is legitimate. This is a great operation. These are, you know, great cattle. Mr. McDonough knew cattle and went and saw these cattle and saw the value of these cattle. Perhaps he wouldn't do what an attorney would do, but this is an average taxpayer with what he knew, with his level of sophistication. And if I could reserve the remaining time. Surely, Mr. Sheehan. May it please the Court, again, I represent the Commissioner in the McDonough case. Starting out with the burden of production, we discussed extensively in our brief that in a partnership case, the partnership does not have independent juridical significance. The penalties are affected items. You start the determination with determining the partnership items at the partnership level, and it carries through. Certainly, the partnership audit started before the effective date of the statute. Some of the other cases that have been cited involve the partner's own personal items that have nothing to do with the partnership. And in any event, we submit it just doesn't matter here. The burden of production is a minor burden. It was put in by Congress so that the Commissioner could not make, could not simply rely on a naked presumption of correctness to get penalties. Here, once you get all the evidence in, any burden of production, when you look at the entire case as satisfied, we go back to the standard burden of proof, which at all times remains on the taxpayer. I also want to correct one thing that is completely understandable in these cases. It was Mr. Keller who waited 10 years, and he conceded a negligence penalty. My notes say that McDonough first learned of the Hoyt in 86, and then he joined in 88 or 89. Moving on to the negligence penalty itself, which is really, you know, what the key discussion is here, the Court has already pointed to many, many different factors. He, Mr. McDonough, deducted far more than he paid in. And indeed, if you look at the Bales case, the taxpayers in Bales conceded that they were only entitled to deduct up to what they paid in.  Two partnerships he never joined, actually. And even if Hoyt had a power of attorney, as far as we know from his record, he was never told he was being moved from partnership to partnership or asked about it until these returns just showed up with these deductions on them. He knew that Hoyt was preparing the returns and that he had to send Hoyt 75 percent of the tax savings being generated, a clear conflict of interest there. If you look at Hansen, you know, all these things would trigger a duty for someone to go to an attorney and have an attorney have a tax professional, CPA, whatever, take a look at it. You can't just rely on the promoter. He thought he knew something about cattle, and he thought that these delayed profits were partly because of drought. He was kind of relying on his common sense knowledge of cattle. It probably was imperfect, but maybe he's in a little different position than some of these other people. He may have not. I'm sorry. Yes. He was a little different position than some other people who were just buying in for the tax benefits. He thought he was making a real investment. At least that's what he said. That's what he said. Maybe he did know a bit more about cattle than some of the others. But here we're talking about tax deductions. And just looking at this, comparing his conduct to Hansen and the other Hoyt negligence cases, there really is very hard to distinguish any of them away. This Court, in Hansen in particular, said the standard was what care did he take. Could he have unraveled the entire Hoyt scheme? The commissioners never asked any of the Hoyt partners to unravel the Hoyt scheme. But did he do what an ordinary reasonable person should do? For example, he says he didn't read the 1,000-pound tax shelter because it dealt with a different type of partnership setup. But he didn't tell us what he did read, which is not a showing of exercise of due care. We have a conflict of interest issue. We have taking huge deductions. All of these are tax matters. And all of these, an attorney looking at it or a CPA might say, well, wait a second. I read bails. You can't take these extra deductions. That was conceded. And what are you doing taking? Where's the paperwork for TBS 89-1? You joined Timeshare Breeding Services, not Timeshare Breeding Services 89-1, where these other partnerships come through. So while we've never asked any of these partners to go out themselves and start counting cows, there are indications, there are red flags throughout the record, that should have been enough to trigger a duty of inquiry under Hansen and that a tax professional could have picked up on it and said, wait a second, this might not be the best of ideas here. Morrow, the tax court is reviewed under the clearly erroneous standard, and just on this record, on everything in this record, let's see. Yes, he knew that the returns listed the partners as tax shelters. Hoyt's newsletter said these Timeshare Breeding Services, which involved a concept where Hoyt would loan bulls out to various other farms to work with the cows. Hoyt's newsletter is saying we're running a big profit. He gets his return. There are huge losses. How does that square out? Hoyt's newsletter also said there was a huge fight going, a constant battle with the IRS. That should put someone on notice. Is it the government's position, the IRS's position, that if someone comes in, particularly someone who comes in with some knowledge about cattle, does that cut more for or against the taxpayer? Do you hold them to a higher standard of inquiry because they should pick up on the signals, or are you simply saying that any taxpayer, even if they have a modicum of knowledge about the underlying investment, really needs to go to a tax professional to analyze the tax consequences? That's question A, and then subpart B of it would be, and if they do, do you read our cases, or is the commissioner's position that that would then cut off the negligence exposure? In answer to the first question, we are far more focused on the tax aspects of the case and what's showing up on the finances, what's showing up on the return, because the negligence penalty is based on underpayment of taxes. And we submit that there are enough red flags here, even without knowing anything about cattle, that you could apply it. And then the second question. The second question could be, well, there's essentially an advice to counsel defense, but before you answer that, counsel was arguing that he did know something about cattle, therefore, based on his knowledge, he expected these high up-front depreciation and other deductions. That doesn't explain the switching of partnerships, but how does that factor in? It factors in here in that counsel, Mr. McGowan, is also arguing the Bales case as being evidenced by 91 that Hoyt was legitimate. In the Bales case, the partners conceded they could only deduct up to their out-of-pockets. So certainly in this case, I don't see that argument as viable if you're going to also argue that Bales somehow legitimized what he was doing. Secondly, if he had gone to counsel, that certainly would cut in his favor. Or would it totally cut off the negligence penalty? You would have to look at such factors as competence of counsel, what he gave, what materials given to counsel, what opinion counsel gave. So it certainly could cut off the negligence penalty, but you have to look at the facts and circumstances. I'd like to finish up with just one thing. Mr. McDonough tried to invoke two exceptions to the negligence penalty. I'd just like to comment briefly on that. 6663 is a reasonable basis test. It's an objective test. It looks at ñ because it's objective, it doesn't depend on what the taxpayer believed. It looks at the facts at the time the return was filed, the real facts on the ground, not what the taxpayer thought they were, and compares it to the law at the time. I know the taxpayers cited something about you look at the authorities available at the time. Well, you know, if there's a circuit split and you pick one side, you might have substantial authority, even if it's later resolved against you. But you still have to look at the actual facts and the actual laws that existed at the time, and in that regard, bails would not provide a reasonable basis because the facts had changed since then. The other one is the more subjective one. It's 6664, reasonable cause and good faith, and we set forth in our brief why that would not apply here. Can I pose a closing question? I don't think it's raised in this case, but it was adverted to in the prior case. So as going forward, I'd appreciate counsel on both sides addressing two things. One is the repeal of 6662. What does that say about Congress's attitude of going after taxpayers? Because I know that was a big issue. I know back in the late 90s, Congress was very onto CIS and everything else going on on the tax side. So there's some concern I see expressed there. And then on the other side, one of the cases, and I can't remember which now, talks about some of these, and maybe it's argued in your brief, is that Congress also wanted to relieve the burden on the tax court of having to go through all of these valuation issues. So there's a pro, there's sort of a sense that there's a congressional intent toward simplifying the burdens on the tax collection system. But there's clearly also, I know, around this time, history of Congress being quite concerned about an overbearing tax collection system. I could address that now, or do you want me to address it? I'll leave it up to you. Just go ahead and answer it. Okay. In the early 80s, excuse me, valuation, Congress did get concerned about valuation and how valuation issues were clogging up the tax court docket, and that was one of the reasons why we got the valuation penalty in there, to discourage splitting the difference. But then by the late 80s, by 89, Congress thought that maybe there was some overreaching by the IRS, maybe there was too much stacking of penalties, and so they revamped the system. So you still have a valuation overstatement penalty at 20 percent for minor overstatements, or 40 percent, but there's, you know, but stacking was eliminated. And that will, we'll discuss this probably a lot more in the collection due process case about how Congress is constantly tinkering with the code to balance various things. Please don't feel yourself under undue time pressure to answer a question, because this is all somewhat tied up together. First, I want to apologize, but 10 years, I was quite aware that Mr. Keller looked at this for 10 years, and I double-checked the brief I was in, and I swore I was in the Madonna brief, and I'm going to just defer to the brief on that, on that issue. And if it was nice. You're conceding negligence for Port Mr. Madonna because he didn't wait. No. I'm conceding. I apparently couldn't recognize the name Keller versus the Dotto early this morning. I'm very apologetic for that and embarrassed. A couple of points. The bails, the concession, individuals only being able to deduct out-of-pocket is in a footnote, and the financial impact of that is not obvious from the bails case and, frankly, might not be obvious to any tax professional. It read it at least immediately obvious. And also, if you read the bails case, it might be obvious that it looks like perhaps the concession wasn't necessary, and they could have actually won that issue. How much money did Mr. Madonna invest in this? How much money did he put at risk? His personal? You know, I'm going to have to defer to the brief. I looked at that a few days back. I believe it's about $60,000. You're having trouble keeping the cases straight. I certainly am. But one of the things that seems to run across these because it pops up is that people are putting a lot of money into these investment opportunities. I know that was the craze at the time to get big tax write-offs, but there's an absence of getting tax advice, apparently, that these people are putting a lot of money out there, but nobody's going to, even when they're preparing their returns, apparently, going to a tax professional. What is the requirement for an average person? Well, I consider myself an average person. Should every average person go to a tax professional? Yeah. They put that much money into a? As a matter of fact, Mr. Donnell continued to put money and pay, and as of 1992 the refunds were frozen and he continued to pay out of pocket. Like I said, I believe it's about $60,000. So thank you. Okay. Catch your breath and we'll move on to River City Ranches.
judges: Fletcher, Rymer, Fisher